

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF OREGON

**TRISH M. BROWN**
BANKRUPTCY JUDGE

1001 S.W. FIFTH AVENUE, # 700
PORTLAND, OREGON 97204
(503) 326-1592

NANCY C. ANTAL
LAW CLERK

SUZANNE M. MARX
JUDICIAL ASSISTANT

October 21, 2014

### THIS DISPOSITION IS NOT APPROPRIATE FOR PUBLICATION

*VIA ECF*

Brent G. Summers
Tarlow Naito & Summers, LLP
150 S.W. Harrison Street, Suite 200
Portland, OR 97201

Wilson C. Muhlheim
Luvaas Cobb
777 High Street, Suite 300
P.O. Box 10747
Eugene, OR 97440

R. Bruce Dusterhoff
Case & Dusterhoff, LLP
9800 S. W. Beaverton Hillsdale Hwy., Suite 200
Beaverton, OR 97005

Michael H. McGean
Francis Hansen & Martin LLP
1148 NW Hill Street
Bend, OR 97701

Justin D. Leonard
McKittrick Leonard LLP
111 S. W. Columbia, Suite 1100
Portland, OR 97201

Kenneth S. Eiler
515 N.W. Saltzman Rd.
P. O. Box 810
Portland, OR 97229

Re:    In re Christian Marc Brown, Case No. 12-32313-tmb7
       Rebecca L. Brown v. Daryl and Kayleen Buerger, et al,
       Adversary Proceeding No. 14-03104-tmb

Gentlemen:

This matter came before the court for an evidentiary hearing on three matters: 1) All Plaintiffs' and Trustee's Motions to Enforce Settlement Agreement Upon Approval (hereinafter "the Motions to Enforce"); 2) Trustee's Motion and Notice of Intent to Settle and Compromise,

and Order Thereon (hereinafter the "Settlement Notice"); and 3) trial in Adversary Proceeding No 14-03104-tmb (hereinafter "AP 14-03104"), in which Plaintiff seeks a determination that no settlement exists.

Rebecca L. Brown ("Plaintiff") in AP 14-03104 was represented by Brent G. Summers. Christen M. Brown (the "Debtor") was represented by Wilson C. Muhlheim. Defendants Kayleen and Daryl Buerger (the "Buergers") were represented by R. Bruce Dusterhoff ("Dusterhoff") and Justin D. Leonard ("Leonard"). Defendants Bruce Hinchliffe ("Hinchliffe"), Eugene Patterson ("Patterson"), and the Eugene Patterson Trust (the "Trust") were represented by Michael H. McGean ("McGean"). Defendant Kenneth Eiler ("Eiler"), the chapter 7 trustee in Christen Brown's bankruptcy case, appeared pro se. Hereafter, the Buergers, Hinchliffe, Patterson, the Trust, and Eiler will be referred to, collectively, as "Defendants."

For the reasons cited herein, I find that the parties entered into a global settlement on January 27, 2014, albeit not on the terms set forth in the Written Settlement Agreement, as defined herein.

The following findings of fact and legal conclusions constitute the court's findings under Federal Rule of Civil Procedure 52(a)[1], applicable in this adversary proceeding under Federal Rule of Bankruptcy Procedure 7052 and/or 9014. To the extent any findings of fact constitute conclusions of law, they are adopted as such. To the extent that any of the conclusions of law constitute findings of fact, they are adopted as such.

## PROCEDURAL BACKGROUND

All the matters currently before the court arise out of a voluntary chapter 7 case (the "Bankruptcy Case") filed by the Debtor, Plaintiff's husband, on March 29, 2012, as Case No. 12-32313-tmb7. Rex K. Daines ("Daines") represented Debtor in the Bankruptcy Case.

At the time of the bankruptcy filing, the Debtor was a party to two state court actions involving Hinchliffe and Patterson. The first, Deschutes Co. Case No. 11CV1126, was filed by Hinchliffe and Patterson against the Debtor, C.A.O. Timber Inc., and Farm Direct LLC asserting claims for fraud, breach of fiduciary duty, breach of contract, and statutory elder abuse. The second, Deschutes Co. Case No. 12CV0262, was filed by the Debtor and Kimberly Orchards LLC (in which the Debtor held a 41% interest), against Hinchliffe and Patterson (collectively, the "State Court Cases"). Following the bankruptcy filing, Eiler sought and obtained authority to employ F.J. Seibert LLC and Franklin Jason Seibert on a contingency fee basis to represent the bankruptcy estate in Case No. 12CV0262. However, no order was ever submitted.

---

[1] Unless otherwise indicated, all chapter, section and rule references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1532, and to the Federal Rules of Bankruptcy Procedure, Rules 1001-9037. The Federal Rules of Civil Procedure are referred to as Civil Rules.

On July 5, 2012, the Buergers filed Adversary Proceeding No. 12-03167-tmb (hereinafter "AP 12-03167") seeking denial of Debtor's discharge under section 727(a) or, alternatively, a determination that debts allegedly owed to them were non-dischargeable under section 523(a). Debtor disputed the allegations therein and objected to the proof of claim filed by Buergers.

On July 6, 2012, Hinchliffe, Patterson, and the Trust filed Adversary Proceeding No. 12-03169-tmb (hereinafter "AP 12-03169") seeking similar relief to that sought by the Buergers (collectively, the "Adversary Proceedings"). Debtor disputed the allegations therein and objected to the proofs of claim filed by the Hinchliffe and Patterson and the Trust.

On March 15, 2013, the Buergers filed a Second Amended Complaint in AP 12-03167 adding Plaintiff as a party defendant. In their Second Amended Complaint, they sought a declaration that Debtor had an equitable interest in real property located on Knott Road in Deschutes County (the "Knott Road Property") and Farm Direct LLC ("Farm Direct"), both of which were held in Plaintiff's name. Buergers sought to impress those assets with a constructive trust and make them part of the bankruptcy estate for the benefit of creditors. On May 28, 2013, the Buergers filed a Third Amended Complaint adding allegations that the Debtor's transfers of his interests in the Knott Road Property and Farm Direct to Plaintiff were avoidable under state and federal law.

On July 23, 2013, Hinchliffe, Patterson, and the Trust filed a First Amended Complaint in AP 12-03169 adding Plaintiff as a party defendant and seeking to avoid the Debtor's transfers to Plaintiff of his interests in the Knott Road Property and Farm Direct. Plaintiff filed answers to the amended complaints through her counsel, Brian T. Hemphill ("Hemphill").

Trials in the Adversary Proceedings were scheduled for February 10-13, 2014. The parties' trial submissions were due on January 27, 2014. At 10:48 p.m. on that date, Mr. Leonard filed a letter with the court stating, in part:

"I am pleased to report that this evening, the parties agreed in writing on terms to resolve the adversary proceedings and the Debtor's claim objections and to recover property of the Estate through a global settlement. The settlement terms have been approved by the Trustee and now need to be further documented and noticed, as the settlement is subject to Court approval - including in regards to the proposed dismissal of plaintiffs' discharge objections under FRBP 7041.

To allow sufficient time for the parties to document and seek the Court's approval for the settlement, please enter a 60-day settlement order." Defs' Ex. A102.

On January 28, 2014, the court entered orders in the Adversary Proceedings noting that they had been reported settled. The orders stated that the cases would be dismissed in 60 days "unless a stipulated judgment or proposed judgment, whichever applies, is filed with the Clerk of Court" within that time. (Doc. 79 in AP 12-03167and Doc. 69 in AP 12-03169).

On April 12, 2014, Defendants filed motions in the Bankruptcy Case and the Adversary Proceedings seeking authority to upload a proposed LBF 761.2 to notice and approve all previously agreed settlement terms in the Adversary Proceedings. Those motions were granted and, on April 22, 2014, Eiler filed the Settlement Notice. On May 7, 2014, Defendants and Eiler filed the Motions to Enforce. Plaintiff objected to the Motions to Enforce and to the Settlement Notice. On May 14, 2014, Plaintiff filed AP 14-03104 seeking a determination that no settlement agreement existed or, alternatively, rescinding the settlement agreement due to mutual mistake.

On June 30, 2014, Plaintiff filed a motion for partial summary judgment in AP 14-03104 in which she contended that the alleged settlement was void under the Oregon statute of frauds and unenforceable due to the fact that it failed to include essential terms. On August 4, 2014, Plaintiff filed a motion to amend her complaint to conform to the legal theories put forth in her motion for partial summary judgment.

Prior to the evidentiary hearing on these matters I heard oral argument on the motion for partial summary judgment and Defendants' opposition to that motion. At the close of oral argument, I denied the motion for partial summary judgment.

During the course of the trial on these matters, Summers acknowledged that Eiler properly entered into the settlement agreement, should the court determine that a settlement existed, and orally withdrew Plaintiff's responses to the Motions to Enforce.

## SETTLEMENT NEGOTIATIONS

On August 6, 2013, the parties participated in a settlement conference with Judge Randall L. Dunn. Hemphill participated in that conference on behalf of Plaintiff. Michael Fuller, a lawyer in the office of OlsenDaines, P.C., participated on behalf of the Debtor. The parties did not reach a settlement at that time. However, as the scheduled trial date approached, the parties resumed settlement negotiations via a series of emails.

## JANUARY 22, 2014

At 12:34 p.m. Daines sent an email to McGean and Leonard, with a copy to Hemphill in which he states, in relevant part:                                    *

"As I understand it, the settlement conference [with Judge Dunn] resulted in an offer of about $20,000 from Brown to settle, and a demand from the Plaintiffs of about $750,000 to settle. Our offer is designed to pay the parties approximately 50% of the actual original amounts (i.e. half of $334,000).

**Offer**: Christen Brown and Rebecca Brown offer to pay the sum of $167,000 to settle the matters with the following conditions:

1) The sum will be paid in 18 months – Defendant Rebecca Brown
   will be able to qualify for a reverse mortgage at that time
   sufficient to fund the balance of $167,000 (see point 4 below for
   credits to this amount).

2) The sum will be either paid into the chapter 7 estate or directly
   to the plaintiffs as the plaintiffs' [sic] choose. If either the
   trustee or judge require it to be paid into the chapter 7, then it
   will have to be paid in, but debtors do not care if the funds are
   paid directly to the Plaintiffs.

3) All parties will file a mutual release of all claims; state and
   federal, known and unknown.

4) Hinchliffe and Patterson will cause the Kimberly property to be
   sold at a price suggested by a realtor and listed no later than
   March 31, 2014. From the sale's proceeds, Hinchliffe and
   Patterson will be reimbursed the $978,500 that was the
   foreclosed amount (less any amounts they have received
   previously from a partial sale of the property, if any. Hinchliffe
   and Patterson will retain an amount suggested by an
   independent accountant to cover any capital gains or other taxes
   resulting from the sale, then any additional amounts will be used
   first to satisfy the $167,000 offer noted in point 1 above. If
   there are any funds remaining, they will be paid $10,000 each to
   the parties' various attorneys (i.e. $10,000 to McGean, $10,000
   to Leonard/Dusterhoff, $10,000 to Hemphill, and $10,000 to
   Daines) , then the balance distributed pro-rata to all parties who
   made some contribution in any form for the Kimberly Orchard
   business. If the parties cannot agree on the pro-rata distribution,
   then an independent mediator will be selected to make a final
   determination as to a distribution. The mediator will be paid
   from these funds before this final distribution.

5) All suits between the parties will be dismissed and all claims
   objections will be withdrawn. This is intended as a full an [sic]
   settlement.

6) All attorney fees not paid out in paragraph 4 will be the sole
   responsibility of each party.

7) All aspects of the suit that are not currently public record will be kept strictly confidential except as is necessary to notify the court of this agreement.

8) The Browns are concerned the photos and video of the Property taken by Mr. Dusterhoff. They are concerned that, if those records should fall into the hands of unknown third parties, there could be a risk of burglary. Once the settlement is completed, Mr. Dusterhoff would return all originals and copies of those records to the Browns." Defs' Ex. A11, at 1-2.

At 12:51, Mr. Brown sent an email to Daines from the email ChristenB@bendaccounting.com stating:

"Rex:

The offer is fine-good job.

I am only agreeing because Becky is willing. If this were my fight; my decision would be ignore the offers and take my chances with a judge. I realize my approach is not realistic for the protection of my family.

Becky is having to carry all the freight for producing income and protect herself and her assets from predators and stupidity.

This is an incredible mess and often overwhelming to both of us. Thank you for putting a focal point in there every now and then.

Christen M. Brown" Pl's Ex. 11, at 4.

Prior to sending the email, Daines and Hemphill both received an email from Plaintiff at the e-mail christenbrown@bendtel.net which stated:

"I am good with the offer.
Please use Rebecca not Becky.
Thanks,
Becky" Defs' Ex. A22.

**JANUARY 23, 2014**

At 10:30 a.m., Eiler sent an email to Daines, McGean, Leonard, and Hemphill stating, in relevant part:

"From my perspective, the February trial will determine the bankruptcy estate's
interest in the Knott Road property. I would suggest that we agree that the interest
is 50%. The court could conclude that the estate has no interest...or that the estate
owns all of the property; hence 50%.

Typically, the property would thereafter be listed for sale. I appreciate that Mr. and
Mrs. Brown would prefer that this not occur. I would suggest that we agree that
the value of the bankruptcy estate's interest in the property be set at $500,000 and
that the debtor and his wife be given a reasonable period of time to refinance the
property to cover that sum. Should they be unsuccessful, then the property would
be listed for sale in the normal course and the proceeds divided equally between
the bankruptcy estate and Ms. Brown at closing." Defs' Ex. A23, at 1.

Plaintiff received a copy of this email from Hemphill at 11:00 a.m. Defs' Ex. A23, at 1.

At 11:22 a.m., Leonard replied to Eiler's email, with copies to Daines, McGean, Hemphill,
and Dusterhoff stating:

"I talked to Bruce [Dusterhoff] and our clients should be willing to proceed with
this type of settlement. Bruce and the Buergers have reason to believe the [Knott
Road] property is worth $1.5-$2 million, but Bruce believes our clients would
agree to fixing the amount as long as it is not less than $500,000.

...

We are preparing for trial now, but I'm willing to prepare a settlement agreement if
the Defendants agree to these terms today. Because we're investing a lot of time
and money into preparations for trial. I appreciate the offer of a Trustee-prepared
settlement agreement, but I think it needs to happen now if it's going to happen.
Bruce and Rex -- let me know if your clients are agreeable to this, and we can
discuss resolution of the 523/claim issues separately." Defs' Ex. A12, at 5.

Daines responded at 1:36 PM:

"Justin, I don't understand your position to resolve the 523 claim separately?
Either we aren't going to settle or we are, some partial settlement is meaningless.

If I can take the $500,000 number to my client for full and complete settlement of
all claims, let me know. Also let me know about the other terms in our [January 22
Settlement] offer. If you are saying 'replace $167,000 for $500,000 in paragraphs
2 and 4' and that is your counteroffer, let me know." Defs' Ex. A12, at 5.

At 2:39 p.m., Leonard sent an email to Daines with copies to McGean, Dusterhoff, and Hemphill rejecting the $167,000 and responding to each item within that offer. Defs' Ex. A12, at 3. Similarly, McGean sent an email to Leonard and Daines with copies to Hemphill and Dusterhoff rejecting the $167,000 at 4:56 p.m. Defs' Ex. A12, at 2.

**JANUARY 24, 2014**

At 9:10 a.m., Plaintiff sent an email to Hemphill, Daines, and Michael Fuller complaining about Eiler's involvement in the case. Defs' Ex. A24. Plaintiff testified at her deposition that her business email address is christenbrown@bendtel.net and that she is the only person who uses that account. Defs' Ex. A166, at 8. She also noted that an appraiser was coming "at 10 am today so we will see what the current value is." Defs' Ex. A24.

At 9:43 a.m., Daines responded to Plaintiff's email stating:

"Eiler is playing this the smartest of anyone. Almost no work and he still gets his full commission that the law allows.

Anyway, Buerger has basically stated that they will settle for $500,000, H&P has basically stated that they will settle for $600,000 (and maybe $500,000), Eiler will recommend to the court either one.

They have an alternate proposal to have the home appraised (they do NOT know that you are having that done at this point), and you to pay whatever 50% of the value is. We did not discuss a subtraction for paying off the $93,000 loan or a subtraction for potential realtor fees.

If Becky could ask the appraiser if he has already pulled comps and has a range, than [sic] number would be helpful. Appraisers don't like to give out numbers, but if you can squeeze a number out of him, that would be good to know." Defs' Ex. A25.

At 10:13 a.m., Plaintiff responded to Daines with a cc to Hemphill:

"The appraiser is here right now but says she can not give me a ball park figure. She will know by late Monday or early Tuesday.

I am still against paying half because Chris does not own it!" Defs' Ex. A25.

At 2:45 p.m., Leonard sent an email to Daines with copies to McGean, Dusterhoff and Hemphill stating, in relevant part:

"I'm assuming that we're heading to trial since I've not heard anything regarding settlement. Let me know if that is not the case and/or whether we should enlist Judge Dunn to help.

One more idea -- a huge variable/uncertainty in this case is the true value of the property. We're all in the dark on that important point, and it's particularly important in terms of whether the Browns could refinance if they wanted to and what a reasonable settlement amount would be. I wonder if the parties together proposed to Judge Brown to leave the MSJ on the calender but continue the trial until the parties could get independent valuations of what we are fighting about ... I think it's quite possible Judge Brown will disregard such a request -- even if we all ask -- but it's a possibility. I'm game for the idea because it would buy some time to continue discussions and allow the parties to focus on the legal issue of whether the Estate has an interest in the property. Let me know what you think about this idea. I would only advance it if I could get everyone to join in the request and we did it before the weekend when we'll all be investing our time into trial prep...." Defs' Ex. A13, at 3-4.

At 2:53 p.m., Daines responded to Leonard with copies to McGean, Dusterhoff and Hemphill stating: "Brian and I are meeting the Browns jointly to discuss the settlement status in about an hour. We will email the parties at the end of that meeting. I highly doubt judge brown will postpone the trial." Defs' Ex. A12, at 1.

Approximately, two and half hours later, Daines sent an email to Leonard and Eiler with copies to McGean, Dusterhoff, and Hemphill:

"The Browns hereby increase their offer to $500,0000 [sic]. We withdraw our request in #4 of the previous offer. This offer resolves all issues, assets, suits, etc. between all parties including Mr. Eiler as discussed previously. All other suits will be dismissed with prejudice. Browns need 18 months to be old enough to borrow this amount on a reverse mortgage. However, Browns will pay $25,000 within 90 days good faith payment with the balance of $475,000 paid in 18 months. If the amount is not paid within 18 months, Rebecca Brown will list the home for sale at an amount to be suggested by a realtor and sold with the balance of $475,000 paid from the sale's proceeds. Mr. Hemphill and I have really pushed our clients to come up to this amount suggested by Eiler, so hopefully you can impress upon your clients that this is an acceptable offer.

If there is any possibility that you can accept this offer (subject to Eiler's input, of course, but I think he will agree) over the weekend, we would appreciate it as both Mr. Hemphill and I are spending time on this case for our Monday submissions during the weekend. We will be checking our emails for a response." Defs Ex. A12, at 1.

**JANUARY 25, 2014**

At 4:02 p.m., McGean sent an email to Daines and Hemphill:

"Thank you for your proposal. After spending a lot of time talking to my clients, we have a counterproposal. My clients would agree to your terms below, except as follows:

1. $50,000 earnest money within 90 days

2. $600,000 payable in 18 months, provided that Mrs. Brown provides a promissory note and a second-position (behind the existing mortgage) deed of trust to the trustee in that amount with interest accruing at 9.0% and the understanding that the amount would be due in full in 18 months with no further extensions.

3. We would agree to dismissal of all claims and suits, including any claims by and against the other plaintiffs in the Deschutes Co. 12CV0292. This would extend to North Fork Orchard LLC and any claim against the orchard property. I have made a few calls and I believe that some demand or claim may need to be made against Mr. Seibert (whether it is by Mr. Brown, Mr. Seed, Akin, Ludy, etc.) if the PLF is going to be asked to release or vacate the judgment that has already entered in that case in favor of Mr. Francis.

4. The parties would stipulate to the Hinchliffe and Patterson claims in their current trebled amount and I believe Mr. Leonard and Mr. Dusterhoff would require that same stipulation for Mr. Buerger.

It has taken a considerable amount of effort to get my clients to agree to this. The longer term that the Browns are proposing was especially difficult to sell, but under this proposal the Browns have that extra time as well as an incentive for taking less time. Importantly, it would also completely resolve the pending state court actions for Mr. Brown as well as the other parties who have now engaged new counsel. Those cases remain pending for trial in May in the event that all matters are not resolved next month, so if we can settle Mr. Brown would avoid having to find replacement counsel for those actions. However, we are ready to try those cases as well as next months trial. If you want to discuss, you can call me at \*\*\*-\*\*\*-2296 this weekend." Defs' Ex. A13, at 1-2.

Hemphill forwarded a copy of this response to Plaintiff. Defs' Ex. A30. At 4:58 p.m., within an hour, Plaintiff responded to both Daines and Hemphill:

"At first glance - NO

1) Interest rate is too high
2) the stipulation clause is unacceptable. Chris could never get his license back.
3) $600,000 is out of reach
4) 523 claim is not released

What is the 523 claim??

I also do not want to give anyone a trust deed to anyone. [Sic] As I said before it is too easy for them to get the house.

I kind of had it figured out to get the $500,000 and down but this is not going to work.

Where do we go from here." Defs' Ex. A31.

At 6:35 p.m., Hemphill responds to Plaintiff and Daines: "We can tell them 'no' to their counteroffer. We can make another counteroffer . . . . . .offer to sweeten our offer a little bit (more money up front, agree to pay interest, more money overall, whatever) . Or, we can tell them no deal, we'll take our chances with the judge. Unless anyone has any other creative ideas. Pl's Ex. 11, at 25.

At 7:33 p.m., Plaintiff responds:

"We can not borrow more than we can afford to repay
I could do the $50,000 up front (I think) but I can't go plus $600,000.
$500,000 is stretching the limits.

If we can't work we can't repay. I know they want hide and don't care , they want us to sell

WHY do we have to give up everything and they not give. If everything is dismissed , then EVERYTHING should be dismissed. No stipulation clause or maybe we stipulate they sell the Orchard or something.

I guess we need to know whether it is worth trying to settle or should we just say no and go to trial." Defs' Ex. A36, at 1.

At 7:59 p.m., Hemphill responded to Plaintiff with a copy to Daines: "You could offer $500,000 total, $50,000 of it up front, remainder within 18 months, bearing interest at some low rate (Rex mentioned the federal judgment rate, but I think that is at around .15% right now, probably too low for them to agree to)." Pl's Ex. 11, at 29.

**JANUARY 26, 2014**

At 2:14 p.m. Hemphill sent an email to Daines:

"Spoke to Becky about half an hour ago. She is talking to Chris, then they will call us. She was talking about offering $50k in 90 days with another $500k in 6 months (i.e. a total of $550k) but no trust deed and no interest. I expect she and Chris will want to talk with both of us soon." Pl's Ex. 13, at 35.

**JANUARY 27, 2014**

At 9:19 am, Daines sent an email to McGean and Hemphill with a copy to Leonard:

"Sorry for the delay. We got the Browns to go all the way to $500k as the trustee suggested under the assumption that you were pushing your clients to do they [sic] same. Now they feel that they have been blind sided as your offer is basically around $700k. In any event, the Browns increase their off [sic] to $25k within 90 days and a balanced [sic] of $500k within 18 months, no interest. As before, this is for complete settlement of all claims.

Please let me know if this is agreeable." Defs' Ex. A13, at 1.

At 4:04 p.m., Dusterhoff sent an email, which was not a part of the continuous string, to Daines and Hemphill with copies to McGean and Leonard:

"I appreciate Rex getting back to me and exhibiting some flexibility toward working something out that meets all of our clients' needs. Here are some additional suggestions. I do not have specific client authority, but believe that I can get it if agreed to by your clients without any further attempt to move the bar upward.

1. Total settlement-$550,000.

2. Cash of $37,500 due within 45 days, credit against above $550,000.

3. Deferred balance of $512,500 due no later than 18 months or the Knott Rd. property is put on the market for sale by Mrs. Brown at a minimum price sufficient to liquidate the deferred balance in full. Interest at 6% simple on deferred balance until paid commencing upon approval by the Court of the settlement. See my prior email as to why this is important and fair.

If the property is not refinanced or sold within 21 months (18 + 90 days for sale), the Trustee takes over the sale with Mr. and Mrs. Brown's full cooperation and

attempts to sell it as soon as possible at a fair price. The Trustee to cooperate with any refinance, such as with Wells Fargo now or a reverse mortgage when available, or any sale efforts provided any cash back is used to discharge the above deferred balance.

4. All other issues as previously discussed.

Good faith is the key. I encourage Justin and Mike to comment." Defs' Ex. A14, at 1-2.

At 4:15 p.m., within 11 minutes, Hemphill forwarded that email to Plaintiff. Defs' Ex. A46.

At 5:09 p.m., from a Yahoo email account[2], Plaintiff responded to Hemphill:

"Worst case---

If the trustee gets the property to sell and it sells for 1.5 mil, what happens to the excess?

Do I get it or does the trustee?" Defs' Ex. 47, at 1.

Hemphill responded at 5:59 p.m.:

"If the trustee gets the house and sells it for 1.5M (and the estate is entitled to 50%), so the estate gets $750k and Becky gets the other $750k (after costs of sale, realtor commissions)s. [sic] The trustee takes the $750k that belongs to the estate and pays: 1) trustee's commissions and expenses, 2) priority debts (if any), then the rest to the unsecured creditors (including H&P and Buerger attorney fees). That amount would probably not be enough to pay the unsecured creditors in full, so a portion of the debts would be discharge [sic] (assuming Chris still gets a discharge because every [sic] drops their discharge claims.

Does that answer the question?" Defs' Ex. A47, at 1.

At 5:57 p.m., Plaintiff sent the following email to Daines and Hemphill from christenbrown@bendtel.net:

"Is Dusterhoff speaking for everyone or just Buerger?

---

[2] Plaintiff testified at her deposition that her personal email account address is rebeccalbrown066@yahoo.com. Defs' Ex. A166, at 8.

I am in contact with Casper and at this point he is interested but needs the appraisal value.

If my earlier email didn't go - worst case

   If trustee sells the house for 1.5 mil, who gets the excess above the $550,000 settlement?

I hope we can get this settled soon!!" Defs' Ex. A48.

At 6:02 p.m., Hemphill responded to Plaintiff:

"If trustee sells house for 1.5M, but estate claim is limited to $550k (ignore interest for now), it goes as follows: 1) trustee pays costs of sale & realtor commissions of [sic] the top, 2) pays any secured debts (mortgage, judgment liens), splits whatever is left and $550k goes to estate (to pay trustee and claims), the rest goes to back Becky/Chris." Defs' Ex. A48.

Hemphill sent two additional emails to Plaintiff: one at 6:03 p.m. in which he advised her to call if she had questions as it was quicker than typing emails (Defs' Ex. A49) and another at 6:10 p.m. in which he asked: "So, if Casper needs the appraisal value, does that mean settlement is on hold until you get that appraisal?" Defs' Ex. A50. There was no evidence that Plaintiff responded to the 6:10 p.m. email.

At 6:49 p.m., Daines sent an email to what appears to be the email used by Plaintiff but the "To" line reads Christen Brown:

"We basically have a deal at $550,000 if the others will agree to kick in $31,000. You could agree to kick in the $31,000 if they don't which will result in complete settlement.

I am not going to finish our exhibits unless you tell me too [sic]. I will check my email in an hour.

We can agree via email contingent on the additional $31k, then we can talk to Seed et al's new atty tomorrow and if they will not agree, then you can offer to reimburse them.

4 day trial = 32 plus attorney hours plus costs = a minimum of $10,000 to Brian and $10,000 to me (just for the days of trial) to roll the dice and likely do worse.

Any value and appreciation above the $550,000 belongs to you even if the property is sold in two years." Defs' Ex. A146, at 1.

Neither Plaintiff nor Debtor apparently responded to this email, however, evidence shows that Plaintiff spoke to Hemphill via telephone four times between 8:09 and 8:42 p.m. with the last call lasting approximately four minutes. Defs' Ex. A37, at 4.

At 8:51 p.m., Daines responded to Dusterhoff's email and addressed it to McGean, Dusterhoff, and Hemphill, with a copy to Leonard:

"On behalf of both Browns, we accept the counter proposal as noted in these emails and understand that it is contingent only on the $31,000 noted my [sic] Mike." Defs' Ex. A14, at 1.

At approximately 8:50 p.m., Hemphill replied to Daines, McGean, and Dusterhoff, with a copy to Leonard to this same email string:

"Agreed, subject to the contingency regarding the other parties in 12CV1292 case." Defs' Ex. A15, at 1.

Apparently, neither of these last two emails were sent to Plaintiff or the Debtor.

## POST NEGOTIATION ACTIVITIES

### JANUARY 28, 2014

At 10:30 a.m., McGean and Daines appeared at telephone hearing on a Motion to Quash Trial Subpoena Duces Tecum issued to Christopher Accaragui in AP 12-03169. Hemphill attended the hearing but did not note his attendance for the record. During the hearing, counsel engaged in the following colloquy with the court:

"MR. MCGEAN: ... Your Honor. I represent Bruce Hinchliffe and Eugene Patterson. Mr. Heatherman, who represents Mr. Accaragui and who filed the motion to quash, hasn't directly been involved in any of the settlement discussions that have been occurring, but I did tell him last night that we appear to have settled the case. I don't know if that's the reason why he's not on the line ...

MR. HEATHERMAN: I'm sorry. I'm here, Your Honor.

THE COURT: All right.

MR. MCGEAN: Oh.

THE COURT: So settled the Hinchliffe versus Brown case?

MR. MCGEAN: We have -- we have settled both of these cases, Your Honor, just last night. The Berger [sic] versus Brown adversary proceeding and then the Hinchliffe versus Brown adversary proceeding. I think that there was a -- a letter from Mr. Leonard's office to the Court that was filed late last night, but it probably hasn't reached you yet.

THE COURT: No. It has not. Wow. Good job.

. . .

MR. DAINES: Your Honor, this is Rex Daines. The settlement covers the objections as claims as well. I just wanted to make sure Your Honor is aware of that.

THE COURT: Okay. It covers everything, then. All right. Great.

MR. DAINES: It covers everything." Defs' Ex. A103, at 3:5–4:20.

At 5:10 p.m., Plaintiff sent an email to Daines and Hemphill stating:

"I think we need to squash the settlement offer.

The appraisal came in at $642,000 and a Lis Pendence [sic] was filed on the 21st.

I can not pay $550,000+ when it is only worth $600,000 with over $100,000 in debt.

I will have a copy of the appraisal tomorrow.

Let us know as SOON where we go from here." Defs' Ex. A54.

At 5:17 p.m., Plaintiff sent a second email to Daines and Hemphill stating:

"At this point can I offer $250,000, take it or leave it? What would Eiler say?

If I sold for the $642,000, I still owe $100,000, brings it down to $542,000. 50% is is less than $250,000 with all the costs etc." Defs' Ex. A55.

At 5:53 p.m., Plaintiff sent a third email to Daines and Hemphill stating:

"What if we would go back to our original offer of $167,000? Maybe they would take it now!

I'm still fishing for some kind of justice." Defs' Ex. A56.

At 8:37 p.m., Hemphill responded to Plaintiff by email stating, in relevant part:

"Becky - I don't know where you go from here. We can back out of the settlement.
Nothing is signed or set in stone yet. However, if we back out of the settlement, I
think you are back on track for a trial, with uncertain results." Defs' Ex. A57.

### JANUARY 29, 2014

At 7:35 a.m., Plaintiff sent an email to Daines and Hemphill stating:

"I am really - confused is not the right word but I don't know what is.

I do know that I am scared. Both of us are beginning to have health issues.

I am still working on the $550,000 amount - trying to get it.

Chris wants to offer 50% of the appraised value - they can get their own appraisals
- but he is confident that they will all be similar.

What I do know is that we need to get this behind us so we can heal, work, and get
on with our lives.

I'm sure Chris will contact you this morning." Defs' Ex. A58.

At 9:57 a.m., Debtor sent the following email to Daines and Mr. Fuller:

"I am going to be in front of Judge DeHoog [in the state court proceedings] at
11:15 and he is going to ask me if we have a settlement.

What do I say??" Defs' Ex. 106.

Daines responded at 10:00 a.m. stating: "Tell him yes." Defs' Ex. A106. At 10:02 a.m.,
Debtor forwarded the email and response to Plaintiff. Defs' Ex. A106.

McGean sent a letter to Judge Bagley regarding state court case 11CV1126 in which he
stated:

"I am writing to inform you that the parties have reached a settlement in this
matter. That settlement will need approval in Bankruptcy Court, and I anticipate
having a stipulated motion to dismiss and judgment of dismissal ready within the
next 60 days. Thank you." Defs' Ex. A105.

A copy of this letter was sent to the Debtor, Hinchliffe and Patterson.

Plaintiff, Debtor, Hemphill and Daines met at Hemphill's office to discuss the parties' options in light of the appraisal. Daines and Hemphill both testified that they advised Plaintiff and Debtor that they had several options, including going forward with the settlement, attempting to negotiate a settlement that provided for sale of the property with the proceeds split 50/50 between Plaintiff and the Defendants, either with or without disclosing the results of the appraisal, or simply waiting and hoping that Defendants would soften their demands with the passage of time. Apparently the parties did not reach any definitive decision as to how to proceed. However, they did not immediately notify Defendants that they had received an appraisal setting the value of the Knott Road Property at $642,000.00.

## FEBRUARY 2014

On February 3, 2014, at 9:54 a.m., Plaintiff sent the following email to Hemphill:

"When I got to work today I have a notice that Case 12-32313-tmb7 will be dismissed within 60 days unless a stipulated judgement or proposed judgement is filed.

Did you get one?

What does it mean?

I think you know how scared I am about all this." Defs' Ex. A60.

Hemphill responded via email at 10:23 a.m.:

"We talked about this a bit last week. It's just a deadline.

The attorneys reported to those [sic] Court that the parties had reached a settlement. The Judge responded by giving the parties a deadline of 60 days to turn in the settlement paperwork. If the settlement paperwork is not to the Court by that date, the Judge may dismiss the case. That is all that means." Defs' Ex. A60.

On February 11, 2014, at 1:37 p.m., Debtor sent an email to Daines and Fuller stating, in relevant part:

"Last I recall we were expecting the papers for signature about one week ago. You advised us to hold tight and wait. We are dong a less than exemplary job of the first and an adequate job of the second." Defs' Ex. A133.

Daines responded stating, in relevant part: "Haven't heard anything. . . . I think the older this gets, the more likely they will be to alter the terms, so I think we just wait." Defs' Ex. A133.

On February 19, 2014, at 1:44 p.m., Leonard sent an email to Daines and Hemphill with copies to McGean and Dusterhoff attaching a copy of a draft written settlement agreement dated January 27, 2014. Daines forwarded the email to Plaintiff at 4:51 p.m. Defs' Ex. A126, at 1.

This draft provided, inter alia, that, upon approval, "the Estate shall be entitled to an equitable ownership interest in the Property in the amount of $550,000. . . ." Defs' Ex. A126, at 6. It required that Plaintiff pay $37,500 of that amount "on or before March 13, 2014." It provided that the balance, "which is due no later than July 27, 2015, will bear interest at the rate of 6%." It also provided that if Plaintiff failed to pay the balance when due, she will "market the Property for sale at a price sufficient to pay in full the Deferred Balance." If she was unable to close a sale by October 27, 2015, "the Trustee shall be responsible for selling it." Defs' Ex. A126, at 6.

On February 26, 2014, at 1:56 p.m., Leonard sent an email to Daines and Hemphill stating:

"Rex * Brian -- look forward to hearing from you ASAP regarding the proposed agreement. The Count [sic] needs a settlement notice, which I will take care of filing as soon as the agreement is signed." Defs' Ex. A108, at 2.

Daines responded on February 28, 2008, at 8:08 a.m. stating: "We are meeting with the Browns this afternoon." Defs' Ex. A108, at 1.

## MARCH 2014

On March 3, 2014, Hinchliffe and Patterson entered into a settlement agreement in state court case 12CV0292. Under the agreement, Hinchliffe and Patterson accepted $17,775 in full satisfaction of claims they had against all of the plaintiff parties in that litigation. Defs' Ex. 107, at 4. Hinchliffe testified that he would not have agreed to settle the state court case but for the settlement with the Plaintiff and Debtor.

On March 4, 2014, McGean sent an email to Daines, Leonard, and Hemphill with a copy to Dusterhoff stating:

"As you might have heard we settled with the non-Brown plaintiffs yesterday. Any word on where we are on the Browns' end with the bankruptcy settlement agreement?" Defs' Ex. A109, at 1.

On March 5, 2014, at 8:46 a.m., after receiving a copy of the settlement agreement dated January 27, 2014, Debtor sent an email to Daines in which he states:

"Hunter may give you a call about where Becky and I stand in this train wreck. He could have questions in preparation of motions for the court on the Jason bill matter.

You have my instruction to speak with him and share any information which would assist him.

I have provided a copy of the draft settlement agreement to him. I have some issues with it. Especially if this is a matter of public record!!!!!

I understand the 12 case with the Alaska members has settled, removing this stipulation from the settlement agreement.

Becky states that she understands we will be in default of the agreement on the 13th. I asked you earlier what we needed to know about this going so badly. We are still looking for your instruction. We do not need any more surprises." Defs' Ex. A129.

On March 7, 2014, at 3:58 p.m., Daines sent an email to Leonard in which he stated:

"When we original [sic] began negotiations to settle this matter, the immediate sale of Mrs. Brown's property on Knott road was one of the proposed solutions. Mrs. Brown was opposed to that as keeping the home was her top priority. As a settlement, we had discussed selling the property with the proceeds of the sale divided with ½ going to Mrs. Brown and ½ going to the estate. We want you to again consider this option at this time. When we met with the Brown's [sic] last week to review the draft settlement agreement, Brian and I both understood the Brown's [sic] had changed their priorities and keeping this parcel is no longer the issue. They both are in need of emotionally getting on with their lives and clearly, with the proposed draft settlement, struggling to keep the property for the next 18 months and possibly failing in that attemp [sic] is not conducive to 'moving on'. Using this sale of the property proposal; the funds will be realized sooner by you, your clients and the estate and there will be no question as to fairness for all concerned.

Please let me know if you think your clients are open to altering the agreement in this manner." Defs' Ex. A75, at 4.

Leonard responded to Daines at 3:13 p.m. on March 10, 2014, with copies to McGean, Dusterhoff and Hemphill:

"Thanks for your email. The Buergers - - as well as the other parties I imagine -- are relying heavily on the settlement payment of $550k plus interest. Therefore, this alternative would be acceptable only if the Browns agree to those terms (*i.e.* the first

$550k from the sale price would be paid to the Estate, along with any interest until the payment is made.)

I've not talked to Mike about your proposal, but based on our prior communications regarding the settlement, I believe the parties would not want to risk the possibility that 50% of the proceeds would be less than what was agreed upon. I understand that the parties are willing to give up any resulting upside (even if significant) in exchange for the certainty provided by the deal that was negotiated.

I don't think the settlement has to be changed to reflect the Brown's [sic] current interest in selling the property faster than before. Let me know if you think otherwise, or if there are any other changes to the proposed document to reflect the terms of the parties' agreement." Defs' Ex. A75, at 3-4.

At 9:56 a.m. on March 11, 2014, McGean sent an email to Leonard and Daines with copies to Dusterhoff and Hemphill:

"My clients feel the same way as the Buergers. I agree with Justin that the settlement agreement we reached would allow the Browns to sell the property soon if they want to do that. We will enforce that agreement. Please let us know if the form of the document proposed by Justin is acceptable and all of us can arrange to have our clients sign it. Thanks." Defs' Ex. A75, at 3.

On March 12, 2014, at 3:40 p.m., Hemphill sent an email to McGean and Leonard with copies to Dusterhoff and Daines stating:

"Thank you for your emails. I have forwarded them to my client and have briefly discussed them with her. Unfortunately, I am not in a position to respond substantively at this time. I still need to confer with Rex, and I think (but am not sure) that Rex is out of the office the remainder of the week. I am also out of the office at a CLE today through Friday. So, I do not expect to be in position to respond to your email before early next week.

However, I do need to raise a timing issue. The proposed written Settlement Agreement contemplates that Mr. or Mrs. Brown make an initial cash payment of $37,500 on or before March 13, 2014. However, at this point, Mrs. Brown has not accepted or executed the written Settlement Agreement document and will not be making any payment this week. In addition, the Settlement Agreement document has not yet been approved by the court.

In any event, we need to resolve the issues that Rex raises below in conjunction with any payment timing issues. We also need to discuss the removal of the Notice of Pendency of Action recorded by the Buergers because it is preventing Mrs.

Brown from obtaining a loan to finance any portion of a settlement that she may ultimately approve.

I will have limited email access over the next few days, but please let me know if you have any questions." Defs' Ex. A75, at 2-3.

On March 13, 2014, at 11:51 a.m., McGean responded to Hemphill's email:

"Mr. and Mrs. Brown have had the proposed settlement document for nearly a month. They have not offered any objections to the form of that document. I understand your email to state that Mr. and Mrs. Brown will not be making the $37,500 payment because the document has not been signed yet. However, the Browns' delay in signing the document has caused that problem. Are you proposing that the settlement document require payment of $37,500 by 45 days from execution? We need to get it signed, and if the Browns are refusing to sign we need to know that so we can go ahead and seek to have our agreement enforced." Defs' Ex. A75, at 2.

At 4:13 p.m. on March 13, 2014, Leonard added to this email chain:

"Bruce and I concur with Mike. I can revise that aspect of the settlement -- i.e., to reflect a 45-day period from the date of signing. If we can do that, are the Browns otherwise prepared to sign? Please let us know ASAP so we can wrap this up." Defs' Ex. A75, at 1.

Hemphill responded at 10:47 a.m. on March 17, 2014:

"Mike and Justin - Sorry for the delay in getting back to you. Rex and I need to discuss this case. I have tried to reach him earlier today, but his receptionist reports that he is in a hearing all day today. I am hoping that Rex and I can talk Tuesday morning and have a response to you later on Tuesday." Defs' Ex. A75, at 1.

On March 17, 2014, McGean sent a letter to Daines and Hemphill stating:

"I am enclosing with this letter a copy of the form of Settlement Agreement that Mr. Leonard previously circulated to you for your clients' signatures. As you can see, the form of the agreement makes the payment of $37,500 initial deposit due within 45 days of the execution of the release, consistent with Mr. Hemphill's concerns about that deadline.

My clients and Mr. & Mrs. Buerger have signed it. The original executed copy is enclosed with this letter to Brian so that he can arrange to have it signed by Mrs. Brown and then send to Rex for Mr. Brown's signature. Please have your clients

sign where indicated, and return the original to my office so that I may forward it to
Mr. Eiler for his signature as well. Time is of the essence and given the delay
already in your clients' approval of this document, please have the signed original
back to my office or to Mr. Leonard's office no later than this Friday, March 21,
2014. If we do not receive your clients' signatures by that date, Mr. Leonard will be
making immediate arrangements for an expedited hearing before Judge Brown."
Defs' Ex. A76, at 2.

The settlement agreement contained in this letter will hereinafter be referred to as the Written
Settlement Agreement, which the court will distinguish from the actual settlement agreement.

On March 20, 2014, Hemphill sent a letter to Leonard and McGean stating, in relevant part:

"I have reviewed Mike's letter dated March 17, 2014, which enclosed a copy of the
proposed Settlement Agreement executed by your respective clients. I have
forwarded the letter to my client and discussed it with her. For the reasons
described in this letter, Mrs. Brown does not accept and is not willing to execute the
proposed Settlement Agreement.

As you know, the proposed Settlement Agreement is the result of settlement
negotiations among counsel, which were initiated by Rex Daines and me. On
January 22, 2014, Rex sent you both an email containing a settlement offer from our
clients.

On January 23, 2014, Ken Eiler sent all of us an email advising that he was
supportive of settlement negotiations. Mr. Eiler also suggested that the parties
consider a settlement outcome in which the bankruptcy estate would receive a fifty
percent (50%) interest in Mrs. Brown's Knott Road property ( "Property"). Based
on his awareness that the Browns' [sic] preferred to keep the Property if possible,
Mr. Eiler suggested a settlement that would give the Browns the chance to refinance
the Property to pay off the bankruptcy estate's interest in the Property. If the
Browns could not refinance the Property, Mr. Eiler suggested that it be sold with the
proceeds divided 'equally between the bankruptcy estate and Ms. Brown at closing.'

I believe that email guided the negotiations from that point forward. However, from
my perspective, all of the parties contemplated and intended that the result of the
settlement would be that the bankruptcy estate's interest in the Property would be
approximately fifty-percent (50%) of the value of the Property. Mr. Brown had
estimated the value of the Property to exceed $1 million. Justin has incorporated
that estimate into Recital C of the proposed Settlement Agreement. In his January
23 email to Mr. Eiler, Justin advised that his clients had 'reason to believe the
property [was] worth $1.5-$2 million' but that they would likely agree to a fixed
amount not less than $500,000.

....

> However, we have since learned that the Property value is not $1 million or more. Rather, the Property is worth significantly less, around $650,000.

....

> I believe that all parties were mistaken as to the material fact of the value of the Property at the time of the settlement negotiations, and that the mistake is so fundamental that it frustrates the purpose of the proposed Settlement Agreement, and that Mrs. Brown did not bear the risk of that mistake. As a result, Mrs. Brown can likely seek rescission or reformation of the proposed Settlement Agreement. In addition, there may be other defects in the formation of the Settlement Agreement.

....

> I suggest that we schedule a conference call to discuss these issues as soon as possible. Mrs. Brown is still very interested in settlement. I believe that the existing proposed settlement can be modified to address the parties fundamental mistake regarding the value of the Property and to better reflect the parties' manifest intent." Defs' Ex. A4., at 1-3.

A copy of this letter was sent to Plaintiff via email. The parties' efforts to negotiate a further settlement were unsuccessful and these proceedings followed.

## DEMEANOR AND TRIAL TESTIMONY

At trial, Plaintiff testified that she never "authorize[d] Mr. Hemphill in writing to accept the specific terms that Mr. Leonard wrote out in the eight-page settlement agreement that [she] refused to sign" and that she never gave him "oral authority to accept those terms as set forth in that eight-page settlement agreement." Trial and Hr'g Tr., at 3-4. I find these statements to be credible in so far as the Written Settlemetn Agreement differed from the email correspondence. However, Plaintiff's assertion that she never agreed to a settlement on the terms set forth in the emails among the parties' counsel between January 24, 2014 and January 27, 2014, is not credible.

Throughout her testimony, Plaintiff repeatedly stated that she was unable to remember much about either the settlement negotiations or the events that occurred after the matters were reported settled. Plaintiff was clearly very active in the settlement negotiations, trading numerous emails with both her counsel, Hemphill, and her husband's counsel, Daines.

When asked whether she discussed the settlement proposals coming from her side with the Debtor, Plaintiff responded:

"A.     I don't remember, because I don't remember whether he was home or
wherever I was doing the discussions." Trial and Hr'g Tr., at 13.

Plaintiff's cross examination by McGean elicited the following colloquy regarding the

$500, 000 offer made on her behalf.

"Q.     All right. You made another settlement proposal a little bit later where you
were offering $500,000 payment as a complete settlement; is that right?
A.     I don't know.
Q.     Five hundred thousand dollars.
A.     I don't remember. Which document?
Q.     Well, so you don't remember making that offer?
A.     No, I don't.
Q.     And you never approved an offer for $500,000?
A.     I don't remember making it.
Q.     Are you surprised to hear that your attorneys made an offer to settle the case
for $500,000 on your behalf too?
A.     I believe the numbers were being negotiated. It may have been a number
that was put out there, but I don't remember how it came about.

Q.     All right. Look at Exhibit A-28 if you will, Mrs. Brown.
A.     Okay.
Q.     Okay. Now, on page 2 you'll see that on Friday, January 24th, Mr. Daines
wrote that the Browns hereby increase their offer to $500,000. Do you see that?
A.     I do.
Q.     Is it your testimony then that he, Mr. Daines, sent out that offer also without
your permission?
A.     I will tell you I don't remember.
Q.     Okay. Look at Exhibit A-31, Mrs. Brown, please.
A.     A-31? Okay.
Q.     And does that reflect e-mail correspondence between you and your attorney Mr.
Hemphill where you are responding to a settlement proposal from my office for a payment
of $600,000?
A.     Yes.
Q.     Okay. Now do you see down below where it says that I kind of had it
figured out to get the $500,000 --
A.     Yes.
Q.     -- and down, but this is not going to work?
A.     Yes.
Q.     Do you see that part?
A.     Yes.

Q.     So you were aware on January 25th, 2014, that Mr. Daines and Mr. Hemphill had made an offer calling for you to come up with the payment of $500,000, right?

A.     It looks that way, yes." Trial and Hr'g Tr, at 15-17.

Questions regarding the subsequent $525,000 offer elicited the following:

"Q.     And isn't it true then that you increased your offer to $525,000 on Monday morning, January 27th, 2014?

A.     After all of this I'm getting confused, but I believe that is correct. I don't know.

Q.     Okay. No problem with authority on that, right?

A.     I guess, I – no, I don't know whether I. I don't know whether I gave them authority or whether it was something that was discussed and they said let's try it. I don't know.

Q.     Look at Exhibit A-13, please. I'm going to point you specifically to the e-mail that's at the top of that thread from Rex Daines to me and to Mr. Hemphill, copy to Mr. Leonard.

A.     Okay.

Q.     Okay, do you see that?

A.     Yes.

Q.     And did you authorize the payment -- or the settlement proposal that Mr. Daines is making there where you and your husband would come up with $525,000 total?

A.     I don't remember." Trial and Hr'g Tr., at 17-18.

When asked about her receipt of the email from Daines stating that the parties basically had a deal at $550,000, Plaintiff responded as follows:

"Q.     Okay. And you did receive the e-mail from Mr. Hemphill forwarding the e-mail from Mr. Daines that said we basically have a deal at $550,000, you did receive that, right?

A.     I believe so, yes.

Q.     Okay. And you didn't write back to say no we don't have a deal?

A.     I don't remember reading that e-mail, honestly. I believe at that time, Chris and I were sitting there talking.

        And the e-mail had been sent to Chris's business instead of to home; we had to find it. And when it came in, I let Chris read it, because it was from his attorney to him.

Q.     Okay. Even though it came in -- it did come into your e-mail though, right?

A.     The e-mail I use, yes.

Q.     Okay. So you saw it and didn't read it then; is that right?

A.     I don't remember reading it.

Q.     You just had your husband read it instead of you?

A.     I asked him to come to the computer and read it because it was from his attorney.

Q.     All right. After he had a chance to read it, did you discuss it together?

A.     I believe we did. And if I remember correctly, it had been sent much earlier that afternoon with a response time of an hour and that hour was long past gone, and so the e-mail really didn't matter." Trial and Hr'g Tr., at 19-20.

When asked whether she had discussion with Hemphill after receiving the e-mail from Daines stating that the parties basically had a deal at $550,000, Plaintiff answered: "I don't remember the sequence of events, but I know I talked with Mr. Hemphill several times that evening." Trial and Hr'g Tr., at 20-21. With respect to those conversations Plaintiff stated: "I don't remember exactly what he -- what we talked about." Trial and Hr'g Tr., at 21. However, at her deposition, taken on August 5, 2014, less than three weeks prior to trial, Plaintiff testified that she discussed the status of the settlement negotiations with Hemphill during those conversations. Def's Ex. A166 at 23.

When asked how she learned that a global settlement had been reported to the bankruptcy court, Plaintiff answered: "I don't know." Trial and Hr'g Tr., at 22. She conceded that she received a copy of Mr. Leonard's letter to the court reporting the settlement, but when asked whether she read it Plaintiff responded: "I probably skimmed it. I didn't know that I read it thoroughly." Trial and Hr'g Tr., at 23.

When questioned about when she learned that the trial scheduled for February 10, 2014, had been cancelled, Plaintiff responded as follows:

"Q.     When did you become aware that the trial had been cancelled?

A.     I believe it was Wednesday evening, January 29th.

Q.     Okay. And who told you that?

A.     Mr. Daines.

Q.     Was that over the telephone or how?

A.     It was at a meeting at Mr. Hemphill's office.

Q.     And what did he say about why the trial had been cancelled?

A.     I don't remember specifics. I know he had to look it up on his computer to see whether it was still on the docket. I believe there was some discussions about the settlement offer and they were waiting for some sort of draft agreement or something.

Q.     Did you ask why the trial had been called off?

A.     No, I did not.

Q.     Nobody told you that it was because the cases had been reported as settled?

A.     I don't remember that specifically, no." Trial and Hr'g Tr., at 24-25.

Questions about Plaintiff's failure to disclose the existence of the appraisal to opposing parties elicited the following:

"Q.     Mrs. Brown, maybe you could tell us in your own words why you didn't
want -- or why you didn't direct Mr. Hemphill to disclose the Mid Oregon appraisal
to my clients and Mr. Dusterhoff's clients after you got it.

A.     I told him about it. And because he was my attorney, I assumed he knew
what was best.

Q.     You didn't object to keeping --

A.     I don't --

Q.     -- keeping the wraps on it for a while though, did you?

A.     I don't remember exactly. I know there were a lot of discussions that night
and I believe I wanted him to. I don't remember whether I said it. I don't know
what happened." Trial and Hr'g Tr., at 33.

Plaintiff responded similarly to questions posed during her deposition. When asked why
she retained Mr. Hemphill, Plaintiff responded, "Because my husband had filed bankruptcy, I felt I
was being -- they were coming -- somebody -- I don't know. I don't know how to - - I do not
remember the exact reasons. I know that it had something to do with the bankruptcy and that I
needed protection. I don't remember the exact reasons." Defs' Ex. A166, at 6.

When asked whether she hired Hemphill, in part, to negotiate on her behalf, Plaintiff
responded as follows:

"A.     For certain things, yes.

Q.     For what?

A.     Whatever he needed to at the time. I don't know.

Q.     Was there anything in particular that you expected Mr. Hemphill to
negotiate on your behalf?

A.     I don't know what to expect so I don't know what he would be negotiating
at the time or if he would." Defs' Ex. A166, at 6-7.

Plaintiff was evasive on the stand. She only answered clearly when Summers asked leading
questions which the Court finally admonished him for doing. She did not remember specifically
any of the offers above the $167,000 offer. Moreover, I simply do not believe that after all the
email correspondence with Daines, Plaintiff did not read the emails discussing the settlement.

Plaintiff was actively involved in the settlement as the email strings reveal. It strains
credulity that she remembers none of them; isn't sure whether she authorized $500,000, then
$525,000, but is quite positive she did not authorize the $550,000 offer as contained in the Written
Settlement Agreement. In fact, based on Plaintiff's testimony, she was barely aware of the
$550,000 offer, despite having asked Hemphill specific questions about the disposition of the
proceeds of the sale of the Knott Road Property were those proceeds to exceed $550,000. Further,
she does not remember discussing that offer with Hemphill during her telephone conversations
with him on the evening of January 27, 2014, despite the earlier exchange of emails regarding the

possible sale of the Knott Road Property and her expressed interest in seeing that those matters were "settled soon."

Plaintiff's last telephone conversation with Hemphill ended at 8:46 p.m. Within the next six minutes both Hemphill and Daines sent emails to opposing counsel accepting a $550,000 settlement on behalf of both the Debtor and the Plaintiff.

Hemphill testified that he received oral authority, either directly from Plaintiff or from Debtor, to accept the settlement on behalf of both of them. Daines testified that he received authority to do the same, either from Hemphill or the Debtor. I find Daines and Hemphill's testimony to be credible. Both are seasoned counsel and long standing members of the bar. I find it inconceivable that not one, but both of them, would accept a settlement on a client's behalf without receiving authorization to do so. Given the timing of the telephone calls between Plaintiff and Hemphill and the subsequent emails from Daines and Hemphill accepting the settlement, as well as the proffered testimony and Plaintiff's lack of credibility, I find that Plaintiff, either directly or through the Debtor, gave both Daines and Hemphill oral authority to accept a $550,000 settlement offer on her behalf.

Plaintiff and Debtor had separate interests in these matters and separate counsel. However, the evidence shows that Plaintiff, Debtor, and their counsel met jointly on more than one occasion to discuss settlement. All of the settlement offers previously made to Defendants had been made jointly by Plaintiff and Debtor. Plaintiff regularly communicated via email not only with her own counsel, but also with Debtor's counsel.

In all the emails, Debtor only wrote about the settlement once before January 27, 2014. Debtor was clearly willing to agree with whatever Plaintiff would agree to.

Although Plaintiff testified that the decision as to whether to settle the litigation was her's alone (Trial and Hr'g Tr. at 4), it is clear from the emails between Plaintiff, Debtor and their respective counsel, that Plaintiff and Debtor were working jointly to achieve a global settlement with Defendants. Accordingly, I find that Daines and Hemphill had either actual or apparent authority to accept the $550,000 settlement on behalf of Plaintiff and the Debtor. They did so at 8:51 p.m. on January 27, 2014, and Plaintiff was bound by the terms of that agreement.

This conclusion is reinforced by the Plaintiff's subsequent behavior. Plaintiff testified that when she went to bed the night of January 27, 2014, she believed that negotiations with respect to the settlement were on-going. However, she made no attempt to contact her attorney to discuss the status of the negotiations until 5:10 p.m. on January 28, 2014, after receiving the appraisal valuing the Knott Road Property at $642,000.00. Defs' Ex. A54. In that email, she told Hemphill that he needed to "squash the settlement offer" and that she could not "pay $550,000+" given the $642,000 appraisal. Defs' Ex. A54.

Plaintiff argues, through her counsel, that the reference to a "settlement offer" is evidence that Plaintiff believed the settlement negotiations were still on-going. I disagree. I read this email as evidence that Plaintiff was aware that her attorney had accepted the $550,000 settlement on her behalf and she wanted him to withdraw that acceptance. In fact, Plaintiff continued to attempt to raise the $550,000 needed to pay the settlement even after receiving the appraisal. Defs' Ex. A58.

Tellingly, at no point between January 27, 2014, and March 20, 2014, did Plaintiff tell this court or the opposing parties that she did not agree to the terms of the offer accepted on her behalf by Hemphill and Daines. In fact, on February 11, 2014, despite the fact that no further negotiations had taken place, Debtor sent an email to Daines and Fuller stating he was "expecting papers for signature" (Defs' Ex. A133). On February 29, 2014, Plaintiff sent an email to Hemphill in which she stated that she had "gotten some questions from Mr Chappell about the BK and the settlement that [she could] not answer adequately." Defs' Ex. A62.

On March 6, 2014, more than a month after Plaintiff became aware that the parties had advised the court that the pending bankruptcy matters had been settled, she sent an email to Hemphill stating:

> "My biggest problem right now is the settlement agreement has a first pay date of NEXT Thursday. How am I suppose to comply when I can't get my loan? What happens if I can't?" Defs' Ex. A69.

It is clear from this e-mail, as well as Plaintiff's other post-January 27, 2014, statements and actions, that she believed she was obligated on the $550,000 settlement. Accordingly, I find Plaintiff entered into a settlement agreement on January 27, 2014 on the terms set forth in the e-mails between counsel for the parties.

1. Terms of the Settlement Agreement

The terms of the settlement as set forth in the emails are different from the Written Settlement Agreement circulated to the parties, and some of the differences are material. For example, the settlement does not require transfer of an interest in the Knott Road Property to Eiler. The agreement as set forth in the emails and accepted by Plaintiff and Debtor are as follows:

a. Total settlement amount is $550,000.00.

b. Payment of $37,500 is due 45 days after approval of the settlement by this court.

c. Deferred balance of $512,500 due no later than 18 months (after approval of the settlement by this court) or the Knott Road Property is put on the market for sale by Plaintiff at a minimum price sufficient to liquidate the deferred balance in full. Interest on the unpaid deferred balance ($512,500) at 6 percent commencing upon approval of the settlement by this court.

    d. If the Knott Road Property is not refinanced or sold within 21 months of approval of the settlement by the court, Eiler takes over the sale with Plaintiff's and Debtor's full cooperation and attempts to sell the Knott Road Property at a fair price. Eiler is to cooperate with any refinance to allow for payment of the $550,000 obligation.

    e. All parties will execute a mutual release of all claims, state and federal, known and unknown.

    f. All lawsuits between the parties will be dismissed and all claims objections will be withdrawn.

    g. Attorney fees will be the sold responsibility of each party.

    h. All aspects of the lawsuits that are not currently public record will be kept strictly confidential except as necessary to notify the court of the agreement.

    i. Once the settlement is complete, Dusterhoff will return to Plaintiff and Debtor all originals and any copies of photos and video of the Knott Road Property taken by him.

2. Enforceability of the Settlement Agreement

    a. Statute of Frauds

    Plaintiff contends that the Written Settlement Agreement is unenforceable because it violates the Statute of Frauds set forth in ORS ORS 41.580(1). This statute, provides, in relevant part:

> "(1) In the following cases the agreement is void unless it, or some note or memorandum thereof, expressing the consideration, is in writing and subscribed by the party to be charged, or by the lawfully authorized agent of the party; evidence, therefore, of the agreement shall not be received other than the writing, or secondary evidence of its contents in the cases prescribed by law:
>
> > (a) An agreement that by its terms is not to be performed within a year from the making.
> >
> > (b) An agreement to answer for the debt, default or miscarriage of another.
>
> ....
>
> > (e) An agreement for the leasing for a longer period than one year, or for the sale of real property, or of any interest therein.
> >
> > (f) An agreement concerning real property made by an agent of the party sought to be charged unless the authority of the agent is in writing...."

    Plaintiff contends that the settlement agreement is void under this statute as follows:

1. The real property sale terms are not to be performed within a year from January 27, 2014, the date upon which the defendants contend the alleged settlement was entered;

2. The purported settlement agreement is void because it requires her to answer for the Debtor's debts;

3. The purported settlement agreement calls for the sale of her real property;

4. There is no writing giving her attorney or the Debtor's attorney authority to enter a settlement agreement on the terms alleged by the Defendants.

Plaintiff is incorrect.

1. The settlement agreement requires that Plaintiff or the Debtor pay the estate a total of $550,000 within 21 months after the settlement is approved by the court. This date is more than one year after January 27, 2014. However, under Oregon law, the fact that a contract need not be performed within one year is not sufficient to bring it within the purview of the Statute of Frauds. "It is only where the contract shows by its terms or where it is within the contemplation of the parties that it cannot be performed within a year that the statute applies. Duniway v. Wiley, 85 Ore. 86, 88-89 (1917) (citations omitted) (emphasis added). Nothing in the settlement agreement prevents Plaintiff or Debtor from making the required payment within a year of the date of the settlement agreement. Accordingly, the settlement agreement is not void under subsection ORS 41.580(1)(a).

2. The settlement agreement does not require Plaintiff to answer for the debt of another. Defendants contended that Debtor held an interest in the Knott Road Property and Farm Direct held by Plaintiff and sought to recover those assets for the benefit of the estate. Plaintiff disputed Defendants' contentions that the Debtor had any interest in either the Knott Road Property or Farm Direct. Ultimately, however, she elected to settle with Defendants and thereby avoid trial on those issues. Accordingly, she cannot now be heard to complain that Defendants failed to prove that Debtor had an equitable interest in the Knott Road Property or Farm Direct. Accordingly, I find that the settlement agreement does not require Plaintiff to answer for the debts of the Debtor.

3. The settlement agreement does not create an equitable interest in the Knott Road Property in favor of the Debtor's estate. Had she accepted the terms of the Written Settlement Agreement she might, arguably, be correct. That document provided that the estate would be entitled to an equitable ownership interest in the Knott Road Property upon approval of the agreement by the court. However, the terms of the email settlement agreement did not contain such language. That settlement agreement merely required that Plaintiff pay the estate the sum of $550,000, selling her real property to acquire those funds, if necessary. Thus, ORS 40.580(1)(e) does not come into play.

4. The settlement agreement does not "concern" real property within the meaning of ORS 41.580(1)(f). See Abraham v. Kendall, 69 OR App. 341 (1984) (Agent did not need written authority to enter into an agreement to obtain county approval for permanent mobile home site where the agreement did not create an interest in real property). Plaintiff and/or Debtor must pay $550,000 within 21 months of approval by the Court. If they do so by whatever means, there will be no need for Eiler to participate in attempting to sell the Knott Road Property.

For the reasons set forth above, I find that the settlement agreement is not void under the Statute of Frauds.

b. Mutual Mistake.

Plaintiff contends that the settlement agreement is unenforceable because it was based on the parties' mutual mistake as to the value of the Knott Road Property. A settlement agreement entered into based on a mutual mistake that was fundamental to the agreement will not be enforced. Silberman-Doney v. Gargan, 256 Ore. App 263, 273 n.2 (2013). The issues, therefore, are 1) whether the parties were mutually mistaken as to the value of the Knott Road Property? and 2) whether the value of that property was fundamental to the agreement.

There was some evidence that all of the parties believed that the Knott Road Property may have had a value of somewhere between $1,500,000 and $2,000,000, significantly more than the $642,000 value ascribed by the appraisal. However, on January 24, 2014, at 2:45 p.m. Leonard sent an email to Daines, which was copied to McGean, Dusterhoff, and Hemphill, in which he stated:

> "One more idea -- a huge variable/uncertainty in this case is the true value of the property. We're all in the dark on that important point, and it's particularly important in terms of whether the Browns could refinance if they wanted to and what a reasonable settlement amount would be...." Defs' Ex. A12, at 2.

This acknowledgment that the value of the property was unknown undercuts Plaintiff's argument that the parties were mutually mistaken as to its value. At this juncture of the negotiations, Plaintiff knew the Knott Road Property was being appraised that day. More importantly, I do not believe that the actual value of the Knott Road Property was the only asset being considered in the settlement.

In AP 12-03167 and AP 12-03169, the plaintiffs all sought determinations that the Debtor's bankruptcy estate had some interest not only in the Knott Road Property but also in Farm Direct. Accordingly, the value of the Knott Road Property was relevant, but not determinative, of the amount to which the estate would be entitled should Defendants prevail at trial of the Adversary Proceedings. Ultimately, Defendants agreed to accept $550,000 in settlement of all of their claims against Plaintiff and Debtor and as to the Debtor's interests in both the Knott Road Property and

Farm Direct. Any party could have suggested a settlement which required an independent appraisal of those assets and a court determination of value, if necessary. None did so.

Plaintiff clearly believed that the Knott Road Property might be worth as much as $1,500,000.00. She had been advised that if she agreed to a sale of the Knott Road Property with a 50/50 split of the proceeds, the estate could be entitled to 50 percent. Defs' Ex. A47. She had also been advised that if the estate's interest was fixed at $550,000, she would receive any net sale proceeds in excess of that amount. Plaintiff also knew that she would have a written appraisal within a day or two and chose not to wait until receiving that appraisal to make offers of $167,000, $500,000, $525,000, and ultimately accept a settlement of $550,000. Knowing those facts, Plaintiff and Debtor agreed to pay $550,000.00. In doing so, Plaintiff rolled the dice, hoping that the value would exceed $1,100,000.00. At least one appraisal is significantly less than that, but there was no evidence of a mutual mistake.

c. Indefiniteness.

Plaintiff argues that the settlement agreement is enforceable because it fails to address at least two material terms: the existing *Lis Pendens* notice (the "*Lis Pendens*") that Defendants had filed against Plaintiff's property, and Plaintiff's liability, if any, for any deficiency on the debt owed to Defendants following a sale of her real property. I do not believe that either term is material to the parties' agreement.

The existence of the *Lis Pendens* and the issue of a deficiency are only material if the settlement agreement provided that Plaintiff's obligation under it was dependent on the sale of the Knott Road Property. However, it did not. Under the settlement agreement, as set forth in the email communications among counsel, Plaintiff and Debtor were obligated to pay Defendants $550,000.00. That obligation was not conditioned upon the sale of the Knott Road Property. Accordingly, there would be no "deficiency", but there could be a subsequent action to recover the $550,000 or less if proceeds reduced this obligation. Likewise, the existence of the *Lis Pendens* was not relevant to the Plaintiff's obligation under the settlement agreement. Since these are not material terms, it was not necessary that they be included in the settlement agreement.

## CONCLUSION

Daines and Hemphill both had authority from Plaintiff and Debtor to enter into a settlement on the terms set forth in the emails between counsel. The settlement agreement does not violate the Statute of Frauds and is not void for indefiniteness nor voidable due to mutual mistake. Accordingly, Plaintiff is bound by the terms of the settlement agreement. I will enter judgment for Defendants in AP 14-03104 and and enter orders granting the Motions to Enforce but only as to the settlement terms set forth in this opinion. Plaintiff has acknowledged that Eiler used his business judgment in entering into the settlement, if one existed, and that approval of the settlement agreement is appropriate. I will, therefore, also enter an order approving the settlement agreement

on the terms set forth above.  Mr. Leonard should prepare orders on these matters and submit them to the court within 14 days.

Very truly yours,

Trish M. Brown

cc:    Rex K. Daines
       Brian T. Hemphill